UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ALFRED SWENSON                            )
                                          )
              Plaintiff,                  )
       v.                                 )         CIVIL ACTION
                                          )         NO.  16-11646-MLW
WILMINGTON SAVINGS FUND                   )
SOCIETY, FSB D/B/A CHRISTIANA             )
TRUST, NOT INDIVIDUALLY BUT               )
AS TRUSTEE FOR PRETIUM                    )
MORTGAGE ACQUISITION TRUST,               )
and SELENE FINANCE LP                     )
                                          )
              Defendants.                 )

**REPORT AND RECOMMENDATION REGARDING MOTION TO**
**DEFINE AND ENFORCE TERMS OF SETTLEMENT AGREEMENT**

January 4, 2021

DEIN, U.S.M.J.

## I. **INTRODUCTION**

The plaintiff Alfred Swenson brought suit against Wilmington Savings Fund Society, FSB and Selene Finance LP challenging the defendants' right to foreclose on his mortgage and seeking a declaratory judgment and damages.  Following a mediation before Senior Judge Edward F. Harrington, the case was reported settled on November 5, 2018.  (Docket No. 49).  However, the parties were unable to consummate the settlement.

The issue before this court is whether a settlement was reached at the mediation and, if so, the terms of the settlement.  For the reasons detailed herein, this court finds that the parties did reach an enforceable settlement agreement before the mediator.  Many of the terms, including, without limitation, a modification of the plaintiff's mortgage loan agreement

to include a reduced principal balance and interest rate, an extended amortization schedule, and a balloon payment covering the interest remaining due because of the extended amortization schedule, are not in dispute.  With respect to the one term in dispute, this court finds, as the plaintiff contends, that the settlement provided for a principal balance of $248,000 with no deferred principal payment due at the end.  Therefore, this court recommends to the District Judge to whom this case is assigned that the plaintiff's Renewed Motion to Reopen Case (Docket No. 53) be ALLOWED, and that the parties be ordered to execute loan documents reflecting the terms of their settlement as described below.

## II.  <u>Overview of Procedural History</u>

This case has a complicated procedural history, which will be summarized briefly herein.

The plaintiff, Alfred Swenson, commenced an action in Essex County Superior Court against Wilmington Savings Fund Society, FSB d/b/a Christiana Trust, not individually but as trustee for Pretium Mortgage Acquisition Trust ("Wilmington") and Selene Finance LP ("Selene"), seeking to enjoin the foreclosure of a mortgage on his home.  The case was originally filed *pro se*, and then an Amended Complaint was filed by counsel.  (<u>See</u> Docket No. 8 at 3).  The defendants removed the matter to this court on August 12, 2016 on the basis of diversity jurisdiction, 28 U.S.C. § 1332.  (Docket No. 1).  The plaintiff was permitted to amend his complaint again, over the defendants' objection.  (Docket Nos. 19, 29).  As detailed in the Second Amended Complaint ("SAC"), Mr. Swenson is seeking a declaratory judgment and damages on the grounds that the defendants lacked jurisdiction to foreclose on his mortgage and committed unfair and deceptive acts and practices in violation of Mass. Gen. Laws ch. 93A. (SAC (Docket No. 30) ¶ 1).  Specifically, but without limitation, the plaintiff alleges that the

defendants have failed to execute an agreed-upon permanent loan modification agreement despite his compliance with the terms of a temporary payment plan ("TPP") required by the defendants as a condition precedent, including making lump sum payments.  (Id. ¶¶ 15-25).

After the trial judge denied the defendants' partial motion to dismiss, the matter was referred to mediation.  (Docket Nos. 37, 43).  The parties mediated the case before Judge Harrington, who reported the case settled on November 5, 2018.  (Docket No. 49).  On November 8, 2018, the trial judge entered a 60-day Settlement Order of Dismissal.  (Docket No. 50).  The Order provided that:

> this action is hereby DISMISSED without prejudice to reconsideration and possible reopening if within 60 days of this Order a motion is filed which represents that the terms of the settlement agreement have not been performed and there is good cause for the non-performing party or parties to have failed to perform.
>
> If no such motion is filed within 60 days of this Order, the case may only be reopened upon a meritorious motion pursuant to Fed. R. Civ. P. 60. See Pratt v. Philbrock, 109 F.3d 18 (1st Cir. 1997).

 (Docket No. 50).

The settlement was not finalized and on January 4, 2019, shortly before the 60th day, the plaintiff filed a "Motion to Reopen Case and for Status Conference" asserting that the defendants had "failed to perform as required pursuant to the terms of the parties' negotiated settlement" and that the defendants were "requiring a condition precedent to their performance that the parties never agreed to[.]"  (Docket No. 51).  The motion was denied without prejudice by the trial judge on January 7, 2019 – the 60th day -- for failure to support the motion by affidavit or memorandum.  (Docket No. 52).  Despite assurances from defense counsel that the plaintiff need not file another motion, on January 9, 2019 the plaintiff refiled a

Renewed Motion to Reopen Case and for Status Conference, with supporting documentation. (Docket Nos. 53-54; <u>see</u> Docket No. 86 (detailing chronology)).  The motion was subsequently referred to this session.  (Docket No. 56).  Well after the time period had expired for opposing the Motion to Reopen, the defendants filed a "Response," admitting that the parties had reached "an agreement in principle" at the mediation and requesting that the matter be returned to the mediator.  (Docket No. 55).

The case was returned to Judge Harrington who met with the parties and reported on August 12, 2019 that "Dispute over Principal Balance was not resolved.  Plaintiff shall move to Reopen case in order to enforce the Settlement of November 5, 2018."  (Docket No. 59).  After some briefing and a hearing, on September 23, 2019 this court entered an order that the plaintiff's Renewed Motion to Reopen would be treated as a procedural request that the court address whether a settlement agreement had been reached and, if so, to enforce the agreement.  (Docket Nos. 61, 70).  After additional briefing, on November 7, 2019 the defendants, in purported response to this court's order of September 23, 2019, filed a Motion for Reconsideration, challenging the court's jurisdiction over the matter on the grounds that the plaintiff's Renewed Motion to Reopen, filed on January 9, 2019, had been untimely.  (Docket No. 78 at ¶¶ 23-24, 27-28).  Numerous hearings and filings followed, including a request for sanctions by the plaintiff.  (<u>See</u> Docket No. 86 at 7-9).

On January 2, 2020 this court issued a Memorandum of Decision and Order on Defendant's Motion for Reconsideration and Plaintiff's Motion for Sanctions denying the motion for reconsideration and issuing sanctions against the defendants.  (Docket No. 86).  As detailed therein, this court concluded that that defense counsel had lulled plaintiff's counsel

[4]

into believing that the Motion to Reopen could be filed on January 9, 2019 without seeking leave of court, and that the positions taken by the defendants as to this court's jurisdiction were frivolous.  (Id.).

On January 23, 2020, an evidentiary hearing was held before this session to determine if a settlement agreement had been reached by the parties at the mediation and, if so, the terms of the settlement.  (See Transcript at Docket No. 108).  It was undisputed that many of the terms had been agreed upon.  Briefly, it was agreed that the plaintiff would make a $45,000 payment, that the loan would be modified to include a $248,000 principal amount, that the loan would have a 4.5% fixed interest rate for 30 years, and that the 30 year loan would be amortized over 40 years, resulting in a balloon payment due at the end of the loan consisting of the unpaid interest.  It became apparent at the hearing that the unresolved issue between the parties was whether the parties had reached an agreement that the plaintiff would make an additional lump sum payment at the end of the loan reflecting other amounts the defendants claimed were due at the time of the mediation.  Thus, the defendants claimed, and the plaintiff denied, that the plaintiff had also agreed to "no debt forgiveness" which, in the defendants' view, meant that there also would be a "deferred principal balance" that would be due as a lump sum payment at the end of the mortgage period.[1]  While the amount and calculation of this deferred balance was not discussed at the mediation, it appears that the defendants may be including some principal, overdue interest payments and penalties in this amount.

---

[1] The plaintiff has been paying the agreed upon monthly payment.  That amount is the same under either parties' version of the settlement, since the amount in dispute would not be payable until the end of the loan, and was non-interest bearing.

[5]

At the conclusion of the evidentiary hearing, the court requested additional briefing and proposed findings of fact and rulings of law.  (See Docket Nos. 90, 96-98).  On February 3, 2020, before the parties had submitted their proposed findings, the defendants filed a Notice of Appeal to the First Circuit purporting to appeal this court's order of January 2, 2020 denying the defendants' Motion for Reconsideration.  (Docket No. 93).  In addition, the parties continued to engage in settlement discussions, which again proved unsuccessful.  (See Docket No. 97).  This court declined to stay the action while the matter was pending at the First Circuit.  (Docket No. 98).[2]  The parties filed proposed findings of fact and rulings of law, and related memoranda.[3]

On September 16, 2020 the First Circuit issued a Judgment dismissing the appeal for lack of jurisdiction.  (Docket No. 112).  The First Circuit agreed "with [Mr. Swenson] that [the defendants] had no reasonable basis for pursuing the appeal given the state of proceedings below, and [defendants'] arguments vis-à-vis appellate jurisdiction are frivolous." (Id.).  The First Circuit's Mandate issued on October 7, 2020, returning the case to the District Court. (Docket No. 114).

---

[2] While the parties filed pleadings after their receipt of the transcripts from the evidentiary hearing, this court ultimately concluded that it would be inappropriate to issue a decision while the matter was pending at the First Circuit, since the defendants had challenged this court's jurisdiction to decide whether a settlement had been reached.

[3] The "Plaintiff's Proposed Findings of Fact and Conclusions of Law" (Docket No. 99) is cited as "PFF." The defendants docketed three separate documents in support of their position: a "Brief in Support of Defendants' Position Regarding Whether a Settlement Agreement Was Reached" (Docket No. 100) cited as "Def. Br.," "Proposed Findings of Fact" (Docket No. 101) cited as "DFF," and Proposed Findings of Law (Docket No. 102) cited as "DFL."  In citing to these findings, the court has considered the opposing parties' responses and the cited materials.  Exhibits from the evidentiary hearing are cited as "Ex."  Each exhibit is treated as an independent document.  Trial testimony is cited by the witness's name followed by the transcript page number.

With respect to the present motion, both parties contend that a settlement had been reached at the mediation, albeit based on their version of the terms.  (See PFF p. 17, ¶ 17 ("Swenson and Selene reached a settlement agreement at the November 5, 2018 mediation consisting of the following terms. . ."); Def. Br. at 1 ("The Defendants take the position that the terms upon which the Plaintiff relies did not result in an enforceable agreement, but the terms upon which the Defendants relied and were made clear to the Plaintiff are the terms of the settlement agreement.")).  After consideration of the testimony, exhibits, and pleadings, this court makes the following findings of fact and rulings of law.  For the reasons detailed herein, this court recommends to the District Judge to whom this case has been assigned that the Plaintiff's Renewed Motion to Reopen be ALLOWED, and that the parties be ordered to execute settlement documents reflecting that the principal amount due is $248,000 with no additional deferred principal balance, as detailed more fully below.

### III.  FINDINGS OF FACT

These findings are based on the testimony presented at the evidentiary hearing on January 23, 2020 from the plaintiff Alfred Swenson, his counsel Christopher Cornetta, Peter Joslyn, who identified himself as a "corporate appearance associate" at Selene responsible for reviewing loan documentation in preparation for trials, mediations and/or depositions, and defense counsel Richard Demerle.  All of these witnesses had participated in the mediation.  In addition, the parties introduced 15 exhibits.  Prior to the evidentiary hearing this court had ordered that it would "not permit evidence or testimony from the mediator" citing Local Rule

16.4(c)(2)(F) and Mass. Gen. Laws ch. 233, § 23C.  (Docket No. 74).  In addition, the court has considered the pleadings filed by the parties after the hearing.  See note 3, supra.

**The Parties**

1.        At all relevant times, Plaintiff Alfred Swenson ("Mr. Swenson") has been the individual owner of a home located at 27 Gilway Street in Saugus, Massachusetts.  (PFF ¶ 1).

2.        On June 7, 2006, Mr. Swenson executed a mortgage on the property for $257,600 with ABN AMRO Mortgage Group, Inc.  (PFF ¶ 2).  The mortgage was then assigned twice.  First, on November 30, 2015, CitiMortgage, Inc., Successor by Merger to ABN AMRO Mortgage Group, Inc., assigned the mortgage to Pretium Mortgage Credit Partners I Loan Acquisitions, LP.  (PFF ¶ 3).  Second, on December 21, 2015, Pretium assigned the mortgage to defendant Wilmington.  (PFF ¶ 4).  Defendant Selene services the mortgage loan on behalf of Wilmington.  (PFF ¶ 5).

**The Issues in the Litigation**

3.        Plaintiff commenced this action on or about July 13, 2016 in Massachusetts Superior Court, Essex County, seeking to stop the foreclosure on his home and challenging Wilmington's status as the holder of the note and mortgage on his property.  (See Docket No. 1 & Ex. A).  After the plaintiff filed his first amended complaint in state court, the defendants removed the matter to this court on August 12, 2016.  (Id. & Ex. B).  The plaintiff filed a Second Amended Complaint on November 3, 2017.  (Docket No. 30).  While this court expresses no opinion as to the merits of the plaintiff's allegations, they are relevant to set the stage for the mediation.

4.      The SAC (Docket No. 30) contains seven claims: Standing -- Lack of Promissory Note (Count I), Standing -- Void Assignments of Mortgage (Count II), Violation of Mass. Gen. Laws ch. 244 § 35A (Count III), Failure to Strictly Comply with Terms of Mortgage (Count IV), Breach of Contract (Count V), Fraud (Count VI), and Multiple Violations of Mass. Gen. Laws ch. 93A (Count VII).

5.      Mr. Swenson alleges that the defendants offered him loan modification terms on August 18, 2016.  (SAC ¶ 15).[4]  The loan modification was to happen in two stages, first there would be a trial payment plan for three months and, if Mr. Swenson successfully complied with the terms, the parties would sign a permanent loan modification.  (See SAC ¶¶ 14-15).  Mr. Swenson alleges that after he complied with the trial payment plan, including making several lump sum payments, the defendants altered the agreed upon terms in the permanent modification plan.  (SAC ¶¶ 18-21).  The changes included reducing the principal by approximately $12,000, which was half of the promised principal forgiveness amount, the removal of a provision that would forgive $129,805.78 after two years of timely payments, and an increase in the agreed upon interest rate from 5% to 5.5%.  (SAC ¶ 21).  Mr. Swenson alleges the defendants breached their contract when they refused to honor the original terms of the permanent loan modification.  (SAC ¶¶ 25, 46-48).

6.      On the day the parties notified the court of their interest in mediating, the plaintiff filed a "Motion to Amend Complaint."  (Docket Nos. 41, 42).  The motion was stayed

---

[4] The SAC has two paragraphs labeled 15.  The court is referencing the first paragraph 15.

when the parties went to mediation.  (Scheduling Order (Docket No. 43) at 1 ¶ 1).  For the

purposes of identifying the issues facing the parties at the time of the mediation, the proposed

Third Amended Complaint is relevant.

7.      The Third Amended Complaint ("TAC") repeats the allegations in the SAC and

adds two claim – a claim of breach of the implied covenant of good faith and fair dealing (Count

VIII) and a claim for intentional infliction of emotional distress (Count IX).  (TAC (Docket No. 42-

1) ¶¶ 96-107). According to the TAC, Mr. Swenson made payments in excess of $40,000 in

furtherance of a mortgage loan modification that the defendants ultimately failed to honor.

(See SAC ¶¶ 27-29).  It also contains additional allegations that Mr. Swenson was charged

$1,312 and $1,393 for insurance policies after he notified the defendants that the policies were

not necessary because he had purchased his own insurance.  (Id. ¶¶ 30-31,35-36).  Further, the

plaintiff added allegations that while this litigation was pending, the defendants set a

foreclosure sale despite an injunction prohibiting such a sale.  (Id. ¶¶ 37-38).  The defendants

cancelled the sale but charged the plaintiff $3,902.87 for the cancelled foreclosure sale.  (Id. ¶

41).  Thus, at the time of the mediation the parties were aware that the plaintiff was disputing

the amount due under the loan.

**The Mediation**

8.      On November 5, 2018 the parties appeared at the Moakley Courthouse for a

mediation conducted by Judge Harrington.  (PFF ¶ 16; DFF ¶ 1).  On behalf of the plaintiff, the

mediation was attended by Mr. Swenson and his attorney Christopher Cornetta.  (PFF ¶ 17).

On behalf of the defendants, the mediation was attended by Selene's representative, Peter

Joslyn, and defense attorney Richard Demerle.  (PFF ¶ 17).  The parties were separated into two

[10]

rooms with their respective counsel, and Judge Harrington met with both parties separately to facilitate the mediation. (PFF ¶ 18). The mediation lasted approximately 4 hours, and the parties all met together with Judge Harrington at the end to review the terms that had been agreed upon. (Swenson:10-11; Cornetta:24).

9.      The parties were in agreement at the onset of the mediation that the goal was to enable Mr. Swenson to keep his home, and to make the monthly payments affordable. (Swenson:16-17; Demerle:101, 106). Mr. Joslyn testified that the principal balance of the loan at the time of the mediation was $269,000. (Joslyn: 95). At no time during the mediation did the parties discuss the total amount of the loan that the defendants' claimed was outstanding, (including, for example, unpaid interest, penalties and the like), even in general numbers. (See Joslyn:80-81; Demerle:103, 127). While Mr. Joslyn testified that he was in communication with Wilmington throughout the mediation, he further testified that he did not have information about the balance of the loan. (Joslyn:81-82, 86-87).

10.    The defendants made two offers before coming to the terms now in dispute. First, the defendants offered "an unpaid principal balance of $260,000, a 4.5 percent fixed rate, 30-year loan, and 40-year amortization[.]" (Cornetta:43). Second, there was an offer that included a principal balance of $260,000 with $25,000 forgiven on the back end of the loan. (Cornetta:47; Demerle:102). The parties eventually agreed to a loan modification with a principal balance of $248,000, an interest rate of 4.5% fixed, and a 30-year term but amortized over 40 years. The second offer with some forgiveness "at the back end" has become significant. In the plaintiff's view this second offer was rejected as the plaintiff "wanted a straight up principal balance [so] that Mr. Swenson knew what he was going to have as his

principal balance[.]" (Cornetta:47).  Having rejected the second offer, Swenson believed it was

of no further significance.  According to the defendants, the fact that there was an offer to

forgive $25,000 at the end of the loan is evidence that the plaintiff knew that he would be

responsible for payment of the unpaid balance of the loan at the end of the loan period.  As

detailed below, this court does not agree.

   11. The parties were also negotiating an upfront lump sum payment from Mr.

Swenson, which ranged from $42,000 to the ultimately agreed upon amount of $45,000.

(Joslyn:89).[5]

   12. It is undisputed that if the loan was to be for 30 years but amortized over 40

years there would be a "balloon payment" due at the end of the loan.  (Cornetta:43).  The

precise amount of that balloon payment could not be set at the mediation, since it would

depend on how much principal was left when the loan was being paid off (*e.g.,* if the loan was

being paid before the 30 years had expired and/or if monthly payments exceeded the minimum

amount due).  However, the parties estimated that with a principal amount of $248,000, and

regular monthly payments of the agreed-upon amount, the balloon payment would be

approximately $107,000.  (Cornetta:44; Demerle:101; Joslyn:96).  It was ultimately calculated

after the mediation to be $107,574.33.  (See Ex. 8 at Balloon Rider).  It is undisputed that this

balloon payment was agreed upon at the mediation.

---

[5] While there was apparently no discussion as to how the $45,000 was to be allocated, neither party considers this
to be a material term precluding an agreement.

13.     In dispute is whether in addition to the balloon payment, the parties agreed that the balance of the outstanding loan (without any reduction) would be added to the end of the loan as a "deferred principal balance."  Again, while the amount and components of this figure were not discussed at the mediation, it appears the defendants' believe it would include the reduction in principal (from $269,000 to $248,000), and "fees, costs, charges, everything that added up to that total balance" that the defendants claimed was due.  (Demerle:113).  The defendants calculated the deferred principal balance after the mediation first as being $125,182.26 and later as $81,242.82.  (Ex. 10 at p.6; Ex. 8 at p.4).  See *infra*.

14.     At the end of the mediation session, the parties met together with Judge Harrington to review the terms of the settlement that they believed had been reached.

15.     The following terms of the settlement are not in dispute (PFF ¶ 20, DFF ¶ 13):

(1)  The mortgage would have an unpaid principal balance of $248,000.00.

(2)  There would be a fixed interest rate of 4.5%.

(3)  The loan would be for 30 years amortized over a 40-year period which would result in a balloon payment.  The parties estimated the amount of the balloon payment would be $107,000.

(4)  Mr. Swenson was to pay $45,000 to the defendants by December 1, 2018.

(5)  Monthly payments at the new rate were to begin in January 2019.

(6)  The defendants would pay Mr. Swenson $9,000 in attorney fees within thirty days of the date of the mediation.  (PFF ¶ 20; Demerle:129).

(7)  The defendants would request that the national credit bureaus delete the tradeline for the mortgage loan from Mr. Swenson's credit reports, and would provide proof that they had done so within thirty days of the date of the mediation.

(8)  There would be no trial plan – the agreement would be a permanent modification.

[13]

16.    Attorney Demerle testified that he would have to check his notes, but "there was an anticipation that we would have things to finalize within 30 days." (Demerle:136).

17.    Attorney Cornetta wrote the terms of the settlement down as

Principal    $248
Rate        4.5%
Time        30-40 amortization
$45,000     12/1/19  [sic]
$1,914.92   1/1/19 PITI
Balloon within one week
Delete trade line
$9k atty fee 30 days
2 weeks

(Ex. 1).  The defendants did not provide any notes from the day of the mediation.

18.    The defendants contend there was an additional term agreed upon, specifically that there would be "no debt forgiveness." (See DFF ¶ 13).  According to the defendants, this "no debt forgiveness" meant that there would be a deferred principal balance payment at the end of the loan, in addition to the balloon payment caused by the 40-year amortization. (Demerle:113-14, 116).  As detailed below, the plaintiff denies that "no debt forgiveness" was discussed and denies that there was an agreement to roll over the unpaid amount of the debt to a payment at the end of the loan.

19.    Attorney Demerle testified that when the parties and Judge Harrington came together at the end of the day he stated

> we have two options right now. We have one where we can do the -- my recollection is we could do the $260,000 with the other terms discussed, and we can forgive some debt on the back end of the loan. It would be approximately -- my recollection is $25,000, and I think that figure was discussed previously. Or we can go in a different route. We can go the lower unpaid principal balance to get a lower monthly payment, but there's not going to be any debt forgiveness with that. . . . I was surprised when Mr. Swenson, after conferring with his

[14]

attorney, said no, the lower monthly payment is the greater concern for me here. And so I want – I want to do the lower monthly payment. I'll do the $248,000 in the agreed-upon unpaid principal balance, **to which I looked at Selene's representative, he looked at me, and I turned back to Mr. Swenson and I said "Just so we're clear, we're going to have a deal that has no debt forgiveness in it?" And Mr. Swenson said, "It's important that I have the more affordable monthly payment."**

> **And I have a very clear recollection of that discussion taking place** because it was a surprise to me that he would leave the $25,000, but nonetheless, its his decision and that's what we were there for, was to give him options so he could tell us what worked for him.

(Demerle 102-03)(emphasis added).

20.     This court does not find it credible that the parties discussed this issue in front of Judge Harrington or at any other point when they were together during the mediation, much less reached an agreement that there would be no debt forgiveness or a deferred principal balance payment at the end of the loan.  Despite Attorney Demerle's "clear recollection" of this dramatic moment, it was not recalled by Selene's representative.  Rather, Mr. Joslyn, in response to a direct question about whether the issue of debt forgiveness had been discussed in front of Judge Harrington, replied that it had been discussed "earlier in the day."  He did not agree that it had been discussed when all the parties met with Judge Harrington. (Joslyn:82 (Q: And was there any discussion regarding debt forgiveness? [Mr. Joslyn]: Earlier in the day.")).

21.     Attorney Cornetta categorically denied that the defendant stated at the mediation that there would be no debt forgiveness.  (Cornetta:47-48).  Mr. Swenson has no memory of debt forgiveness being discussed in front of Judge Harrington.  (Swenson:21). Attorney Cornetta's notes, which were made for the purpose of recording the terms of the settlement, make no mention of "no debt forgiveness."  (Ex. 1).

[15]

22.     Attorney Cornetta did testify that "[a]t one point during the mediation there was

an offer of $260,000 and then something about at the back end, at the end of 30 years $25,000

would be forgiven, but we rejected that.  We wanted a straight-up principal balance amount

[so] that Mr. Swenson knew what he was going to have as his principal balance, which was the

248." (Cornetta:47).  I find this testimony credible.  Mr. Joslyn also testified that various offers

that Selene had made at the outset of the mediation had been rejected.  (Joslyn:82-83).  I find

that "no debt forgiveness" was not discussed with the plaintiff or his counsel.

23.     In deciding not to credit Attorney Demerle's testimony that "no debt

forgiveness" was agreed to at the mediation, this court considered the fact that he also had not

been forthright with respect to other aspects of the deal.  For example, it is undisputed that the

defendants agreed to pay Attorney Cornetta $9,000 in legal fees.  As detailed more fully below,

exhibits submitted by the plaintiff establish that Attorney Demerle repeatedly wrote to

Attorney Cornetta that the defendants would pay him as soon as a specific vendor form was

completed – and payment was in no way linked to settlement documents being finalized or

other pre-payment conditions.  In fact, the parties expected certain terms, like Mr. Swenson's

up front payment of $45,000, to take place prior to the execution of settlement documents.

Attorney Cornetta, appropriately in this court's view, objected to signing the vendor form.  As a

consequence, he was never paid.  At the hearing before this court, Attorney Demerle testified

that Selene had waived the requirement of the vendor form, and that Selene had not made the

payment because the final settlement documents had not been signed.  (Demerle:129, 131-32,

135).  Attorney Demerle conceded that he may never have told Attorney Cornetta that Selene

had dropped this requirement.  (Demerle:135).  The record reflects that he never told Attorney

[16]

Cornetta that payment would have to await the final settlement documents (which was clearly not the parties' expectations at the mediation). The fact that Mr. Demerle was willing to repeatedly misrepresent the status of the payment to another attorney, and/or felt no need to explain his inconsistent positions to either Attorney Cornetta or this court, casts doubt on Mr. Demerle's credibility. For this and the other reasons detailed herein, including the testimony of all of the other witnesses contradicting Attorney Demerle's version of events, this court does not find Attorney Demerle's testimony that "no debt forgiveness" was discussed in front of Judge Harrington and the plaintiff credible.

24.     This court also finds it significant that even under Attorney Demerle's description of events there was no discussion about the components of the total outstanding debt and no express statement that the amount of the unpaid debt would be rolled over into a deferred payment at the end of the loan. The only thing (allegedly) said was "no debt forgiveness." As detailed below, this court finds it unreasonable to expect that such a cryptic statement would result in an enforceable agreement.

25.     Mr. Joslyn testified that in his experience Selene never forgave debt as part of a loan modification. (Joslyn:84). That clearly was not the case in the instant situation, however, since Selene was prepared to forgive at least $25,000 of the debt according to Attorney Demerle.

26.     Mr. Joslyn also testified, in this court's view ambiguously, that there was some discussion of the deferred loan balance when the parties met together, but that he could not discuss the balance because he did not have the amount. (Joslyn:80-82). It is unclear from his testimony whether he believes that there was an express agreement made in front of Judge

[17]

Harrington that there would be a deferred principal balance due and payable at the end of the

loan.

27.     Thus, Mr. Joslyn testified:

So at the end of the session we caucused before the mediator, the retired judge, and
there was an unpaid principal balance of 248 that both parties agreed upon, a set
interest rate at 4.5 percent.  There was a discussion about the waiver of a trial payment
plan, to which we were in agreement with.  There was also a discussion about credit
reporting, how Selene could go about repairing the plaintiff's credit, and then there was
a discussion about, okay, what does the unpaid principal balance – aside from the
unpaid principal balance, what does the amount  -- what amount is that?

And, again, at the mediation that day it was a little unconventional to me just because I
was without a cell phone, without a computer.  Communication was limited.  So I didn't
have access to really any information.  I believe I was using my agent's phone and
actually going downstairs in the lobby to get reception to actually speak with our offices
about numerous communications that day that we were having between parties.
. . . .

-- there was an amount to the unpaid principal balance of 248.  That was agreed upon.
There was an amount – or the interest rate was agreed upon at 4.5 percent.  The
deferred balance amount, there was no discussion about that amount because I didn't
have it to give.
. . . .

… So in that discussion, all parties met, and we discussed the terms.  We heard a little
bit of Mr. Swenson's story, which was important for the mortgage servicer, and then at
that point in time the amount was discussed as to what the unpaid principal balance
was going to be, the rate, and, again, the deferred balance to which I, of course,
explained "I don't have that information to give you today.  However, I would provide it
once I get back to my office and have" – the underwriting department is actually the
ones who do the underwriting of the loan modifications.  "Once they run their
calculations, my attorney could furnish that information to plaintiff's attorney."

Q.  And was there any discussion regarding debt forgiveness?

A.  Earlier in the day.

(Joslyn:80-82)

[18]

28.     All the parties agree that there was discussion about a balloon payment at the conclusion of the mediation.  This court finds that the parties all understood that the balloon payment was the amount of interest that would be due – approximately $107,000 – as a result of the fact that the loan was being amortized over 40 years but was due in 30 years, and that the exact amount of the balloon payment had to be calculated by the defendants' home office. (Swenson:20; Cornetta:43-44, 73-74; Joslyn:93-94 ("A balloon payment is basically any time the amortization goes outside of the original loan terms. . . .  A deferred balance would just be an amount that you are taking off of the loan") 96 (the balloon payment calculation was made after the mediation and was somewhere around $107,000); Demerle:101 (there would be a "balloon payment" of approximately $107,000 due to the amortization of the 30-year mortgage over 40 years).  This court finds further, as the plaintiff and Attorney. Cornetta testified, and as Attorney Cornetta's notes reflect, the defendants did not state that the balloon payment was to include an additional amount of unpaid debt.

29.     While the defendants are now attempting to use the words "balloon payment" and "deferred principal payment" interchangeably, they were not used that way at the mediation, and they are not used interchangeably in the defendants' loan documents, as discussed infra.  Even the defendants' proposed findings of fact link the "balloon payment" to amounts not capitalized due to the 30 year term being amortized over 40 years, and list "no debt forgiveness" as a separate term.  (DFF¶ 13).

30.     This court cannot entirely discount the possibility that there may have been some discussion between Mr. Joslyn and Attorney Demerle about requiring an additional payment beyond the balloon payment at the conclusion of the loan period, but this court finds

[19]

that it was not conveyed to the plaintiff and was not discussed when the parties came together with Judge Harrington to review the terms of the settlement agreement.

31.     This court finds it significant that Attorney Cornetta's notes clearly do not reflect an unpaid principal balance in addition to the balloon payment.  Since the payment terms were of critical importance to the plaintiff, this court find that counsel would have written this term down if it had been discussed.

32.     This court is also not persuaded that the two alleged offers: $248,000 vs. $260,000 plus $25,000 in debt reduction at the end supports the conclusion that the plaintiff understood that there was to be an unpaid principal balance added to the end of the loan.  Nor is it surprising to the court that the plaintiff accepted the first of these options.  As noted above, everyone understood that there was to be a balloon payment at the end of the loan due to the 40-year amortization.  The plaintiff may have reasonably believed that the $25,000 was proposed for a reduction in the balloon payment.  The plaintiff, however, was more interested in having reduced monthly payments than in reducing his balloon payment.

33.     The fact that the plaintiff was most interested in reducing his monthly payments is another reason this court finds the plaintiff's position more credible.  Since the defendants contend that the deferred principal balance would not be interest bearing, and would only be due at the end of the mortgage, there is no reason for the plaintiff not to admit that "no debt forgiveness" was an agreed-upon term, if he had in fact agreed to it.  By challenging the defendants' version of the settlement, the plaintiff has put the entire modification at risk, including the reduced monthly payments.

[20]

34.     I also do not find the defendants' present version of the settlement credible because it gives the plaintiff virtually no credit for his claims and leaves the entire loan amount due in full, including accrued interest and penalties.  According to the SAC, the earlier modification offered by the defendants included a reduction in the principal amount of the debt (although the precise amount of the reduction was apparently in dispute).  The plaintiff raised a claim for breach of this prior agreement in his SAC.  Since Mr. Swenson had apparently made a number of lump sum payments in furtherance of the earlier agreement, his claim of breach is not frivolous on its face.  Mr. Swenson also had claims for overpayments of insurance payments and foreclosure fees.  There is no indication from any of the evidence presented that Mr. Swenson believed that his claims had no merit.  Nevertheless, the value of these claims were not discussed at the mediation, although they most probably would have been if there was to be a deferred payment of the entire loan balance at the end.

35.     There was also evidence presented that the parties never discussed in any form the amount of the alleged deferred principal balance – either specifically or generally.  This court does not find credible the defendants' assumption that the plaintiff would be willing to pay whatever figure the lender eventually determined was due.  The plaintiff was obviously concerned about the terms of his loan, and this deferred amount would have been defined, at least generally, if it was an agreed upon term of the settlement.  In contrast, the parties had discussed that the balloon payment would be approximately $107,000.00.

36.     There is also no reason why the parties could not have agreed on a precise figure for the deferred principal payment since they were settling a dispute, or at least agreed on a ballpark figure.  The amount of the balloon payment had to await calculations about the effect

[21]

of the 40 year amortization of a 30 year loan.  No such calculations needed to be done in establishing an amount of a deferred principal balance as part of a settlement.  It either could have been a compromise figure, or the balance could have been obtained by a phone call to the lender.

37.     The court also finds it credible that after years of litigation the defendants would be willing to accept $45,000 in cash plus a mortgage of $248,000 since the principal amount of the debt due was only $269,000.  If the defendants were insisting on a deferred principal payment amount they were obligated to state so clearly at the time when the terms of the agreement were being reviewed with Judge Harrington.

38.     The defendant's version of events would mean that after paying a lump sum of $45,000 and a principal loan amount of $248,000 plus interest for 30 years, Mr. Swenson would still owe almost $200,000 at the end of the mortgage between the balloon payment and deferred principal balance.  (See Joslyn 96-98).  This court does not find it credible that the plaintiff's assumption of such a sizeable debt was not discussed in some detail if it was to be part of a settlement agreement.

39.     At the mediation, this court finds that the parties agreed to a $248,000 principal balance, a balloon payment of approximately $107,000 based on the amortization schedule, and no deferred principal balance.

### Finality of the Terms at the Mediation

40.     As detailed above, all the parties have agreed that an enforceable settlement agreement was reached at the mediation, provided their understanding of the terms is accepted by the court.  Otherwise, the parties argue that there was no meeting of the minds

[22]

sufficient to create an enforceable agreement.  As detailed herein, this court finds that there

was a binding settlement agreement.  However, this court also concludes that the defendants

did not express their alleged desire to include a deferred principal payment in the settlement

agreement.  Consequently, the binding agreement does not contain such an unexpressed term.

### Post- Mediation Communications

41.     As detailed herein, while the plaintiff promptly complied with his obligations

under the settlement agreement, the defendants failed to do so.

42.     Immediately following the mediation, on November 5, 2018, Attorney Cornetta

emailed Attorney Demerle a copy of Attorney Cornetta's W-9 to facilitate the payment of

$9,000 in legal fees agreed to at the mediation.  (Ex.2).  Prior to the mediation Mr. Swenson had

incurred approximately $15,000 in fees and the $9,000 was to partially reimburse Mr. Swenson

for those expenditures.  (Swenson:11).  The $9,000 payment was due within thirty days after

the mediation.  (Demerle:129, 132).

43.     Although it had been expected that the settlement agreement would be finalized

within 30 days of the mediation, and it had been agreed that the payment of legal fees would

be made within 30 days of the mediation, the defendants did not send any settlement

communications until November 26, 2018.  On that date the defendant Selene sent a "Trial

Modification Plan" ("TMP") directly to either Mr. Swenson or Mr. Cornetta.  (Ex. 10).  The trial

modification plan warned that time was running out to avoid foreclosure.  (Ex. 10:TMP at 2 of

12).

[23]

44. It had been expressly agreed at the mediation that there would be no trial modification plan, just a permanent loan modification. Consequently, it was inappropriate for the defendants to propose a trial modification plan.

45. This court finds that the fact that Selene sent a trial modification plan despite the express agreement of the parties that there would be no trial modification plan is evidence that the "home office" was either not fully informed about the terms of the agreement or misunderstood or ignored those terms.[6]

46. In response to the trial modification plan, Attorney Cornetta asked Attorney Demerle to "[p]lease confirm that, contrary to this correspondence, there is no trial modification plan for this loan, as was agreed to by the parties at the November 5, 2018 mediation. . . . Please send over the permanent loan modification agreement so that I may review it with Mr. Swenson." (Ex.10 at 1).

47. Attorney Cornetta focused on the fact that a trial plan was being proposed, and did not examine the terms of the proposed trial plan. (Cornetta:50 ("I questioned the whole thing. I received a document that said trial modification plan, and we had never agreed to a trial modification plan")).

48. The trial modification plan called for a modified monthly payment of $1,839.20 beginning on January 1, 2019, an "active/interest bearing principal balance" of $248,000.00, a

---

[6] The defendants do not contend that their attorney or representative lacked authority to reach a binding settlement agreement at the mediation, and the record would not support such an argument. See Northern Maine Transp. LLC v. OneBeacon America Ins. Co., 820 F. Supp.2d 139, 145 (D. Me. 2011) (attorney may be given actual authority to bind his or her client to a settlement agreement).

"deferred/non-interest bearing principal balance" of $125,182.26, and a "balloon payment due at maturity" of $107,574.33.  (Ex. 10:TMP at 5 of 12).  There is no indication if and when the "deferred/non-interest bearing principal balance" would be due, if ever.  According to the trial modification plan, the $45,000 payment from Mr. Swenson due on December 1, 2018 was to be applied to a "suspense" account.  (Ex. 10:TMP at 4 of 12).

*49.*   In his November 26, 2018 correspondence challenging the trial modification plan, Attorney Cornetta also sent Attorney Demerle Mr. Swenson's check in the amount of $45,000, which the defendants have kept.  (Ex. 10 at 1; Ex. 3).  Mr. Swenson sent the check despite the lack of any signed settlement agreement, and has made monthly payments in the amount of $1,839.20 despite the absence of any signed settlement agreement.  (See Ex. 9).

50.   On December 7, 2018, Attorney Cornetta sent Attorney Demerle an email, noting that Mr. Swenson's $45,000 had been delivered on November 27, 2018, but Selene had not paid $9,000 in attorney's fees to Mr. Swenson.  (Ex. 4).  The fees were due by December 5 or 6, 2018.  (Ex. 4; Demerle:132).

51.   On December 13, 2018, Attorney Demerle sent Attorney Cornetta by email a draft "Confidential Settlement Agreement and Release of Claims" with an attached "Exhibit A" which purported to identify the "Terms of Permanent Loan Modification Agreement."  (See Ex. 6 at 7).

52.   In his cover email, Attorney Demerle wrote:

Exhibit A to the settlement agreement recites the essential terms of the permanent loan modification.  **My client is still working on the actual permanent modification document**.  As you and I discussed earlier this week, the loan will be adjusted to reflect the permanent modification terms with the January 1, 2019 start date.

[25]

**The "vendor information form" is a form Selene needs you to sign so that Selene can issue the $9,000 check to you out of its corporate account.** Obviously, you are not a vendor in the sense that you work for Selene; nonetheless, I have confirmed with Selene that Selene needs you to complete the form in order to cut the check.  (If you NEED the $9,000.00 sooner, let me know and we can talk about a workaround.)

(Ex. 6 at 7) (emphasis added).

53.     Exhibit A to the draft Settlement Agreement was a chart labeled "Terms of

Permanent Loan Modification Agreement" which provided as follows.

| Downpayment Due Date | December 1, 2018 |
|---|---|
| First Modification Payment Due Date | January 1, 2019 |
| Active/Interest-Bearing Principal Balance | $248,000.00 |
| Interest Rate | 4.5 percent |
| Deferred/Non-Interest-Bearing Principal Balance | $125,182.26 |
| Balloon Payment Due at Maturity | $107,574.33 |
| Principal-and-Interest Payment | $1,114.92 |
| Taxes-and-Insurance Payment | $724.28 |
| Total Monthly Payment | $1,839.20 |

(Ex. 6 at 14).

54.     Nothing in Exhibit A reflects the fact that the $45,000 payment had been made

by Mr. Swenson weeks earlier.  Nor does it provide any details of how the "deferred/non-

interest-bearing principal balance" was calculated or when, if ever, it would be due.  This is in

contrast with the description of the "balloon-payment" which states that it would be "due at

maturity."

55.     Attorney Demerle testified that he had not previously sent the draft settlement

agreement because he was waiting for Selene to provide the loan modification agreement.  By

mid-December he realized that "this wasn't happening."  (Demerle:133)  There was no reason

why the draft could not have been sent before the $9,000 was due to Attorney Cornetta.  (Id.).

[26]

56.     The request that Attorney Cornetta sign the vendor information form in order to receive the $9,000 in legal fees was made after the payment of legal fees was already overdue. Attorney Cornetta objected to signing the form although he did give Selene all the information requested in the form by providing his W9 statement several times.  (Cornetta:30; Ex. 6 at 6).

57.     I find that there was no basis for Selene to require the vendor information form before issuing the agreed upon payment to counsel.  It is undisputed that Attorney Cornetta never provided any services to Selene, and by signing the form Attorney Cornetta might be risking future conflict problems.

58.     As noted above, despite repeatedly informing Attorney Cornetta that Selene needed the form to be signed before the $9,000 could be paid, at the evidentiary hearing Attorney Demerle testified that Selene had dropped that requirement (at an unspecified time) and that the payment had not been made because there was no signed settlement agreement. (Demerle:129, 131-32, 135).  Attorney Demerle never informed Attorney Cornetta that Selene had dropped its requirement for the vendor information form, or that he needed signed settlement documents before payment would be made.  (Demerle:134-35).  Attorney Demerle's written communications and testimony cannot be reconciled.

59.     Again, this court finds that this is evidence that Selene's "home office" either was not fully informed about the terms of the settlement reached at the mediation or misunderstood or ignored those terms.  It is undisputed that the $9,000 payment was due within 30 days of the mediation, and the signing of the final documents was not a prerequisite. Moreover, if the absence of a signed final agreement was the concern, Attorney Demerle should have informed Attorney Cornetta of that fact.

[27]

60.     On December 15, 2018, Attorney Cornetta revised and returned a draft of the settlement agreement and told the defendants he would not sign the "Vendor Information Form" as his firm "is not, and has never been, a vendor for Selene." (Ex. 6 at 6).

61.     Attorney Cornetta testified that when he received the draft settlement agreement on December 13, 2020, and when he responded on December 15th, he was still waiting for an actual modification agreement. (Cornetta:56). The email from Attorney Demerle had stated that the loan agreement was still in the process of being modified by his client. (Ex. 6 at 7). In his December 15th email Attorney Cornetta further noted that despite Mr. Swenson having paid $45,000, Mr. Swenson had not received anything beyond the draft settlement agreement, and that "[a]ll terms of this settlement must be completed/fulfilled by all parties prior to 1/8/2019, as that is [the] deadline for Mr Swenson to reopen this matter with the Court." (Ex. 6 at 6).

62.     This court finds that it would have been helpful if Attorney Cornetta had examined Exhibit A and noted his objection to the deferred principal balance entry. However, this court finds that there never was an agreement to this term, and that Attorney Cornetta made the plaintiff's objection known immediately upon his receipt of the first draft of the final loan agreement documents. See infra. This court also finds that the entry on Exhibit A is ambiguous as to whether it reflects an amount to be paid or written off, and its inclusion in Exhibit A does not alter the fact that it was not agreed to by those participating in the mediation.

63.     Furthermore, this court finds that plaintiff's counsel was forced to devote unnecessary time to keeping the process moving, so it was understandable that he would await

the production of the final loan documents before reviewing the loan terms in detail.  For example, plaintiff's counsel had to continuously pursue defense counsel to resolve the matter within the 60 days allowed by the court order of settlement, repeatedly address issues relating to the payment of the agreed upon legal fees, continuously seek to have the loan documents reflect the fact that the plaintiff had made the $45,000 payment in a timely manner, and repeatedly seek to address the defendants' failure to repair the plaintiff's credit reports.

64.     No explanation was provided to this court as to why the defendants ignored their obligations which were due within 30 days of the mediation, and did not even send drafts of the settlement agreement or the final loan documents for review until after the 30 days had expired.

65.     Plaintiff was careful to comply with his obligations under the settlement agreement.  For example, it is undisputed that Mr. Swenson paid $45,000 by a check sent to and received by defense counsel on November 27, 2018.  Nevertheless, Selene sent Mr. Swenson a statement in mid-December "showing no modification" of the loan.  (Ex. 6 at 2).  At the end of December Mr. Swenson received a letter from Selene stating that "Mr. Swenson's 'forbearance' payment was not received."  (Ex. 6 at 5).  Attorney Cornetta brought this letter to Attorney Demerle's attention, who responded that he would investigate the matter and that, "[i]n the meantime, there is no action for your client to take."  (Ex. 6 at 4 of 8).

66.     These are more examples of either a lack of communication between the defendants' representatives at the mediation and Selene's "home office" or the defendants' intentional or inadvertent failure to comply with the terms of the agreement reached by its representatives at the mediation.  In light of the disconnect between the terms indisputably

agreed to at the mediation and the conduct of the defendants in connection with the settlement, this court does not find it significant that the "home office" included a deferred principal balance in the final loan documents.

67.     Since January 1, 2019, Mr. Swenson has made monthly payments of $1,839.20 to Selene, the amount calculated by the defendants.  (See Ex.9).   Selene has accepted all the checks.  (Demerle:111-12).

68.     On January 2, 2019, Attorney Cornetta wrote to Attorney Demerle as follows:

I write to you pursuant to Local Rule 7.1(a)(2) as I am preparing a motion to return this case to the active docket.  Mr. Swenson timely made both the 12/1/2018 and 1/1/2019 payments.  Conversely, we have not received the $9,000 from Selene that was due within 30 days of the mediation, nor have we received any documentation demonstrating that Selene submitted the request to delete the tradeline to the credit reporting agencies.

The Court's Settlement Order of Dismissal requires the motion to be filed within sixty days of order's date (11/8/2018).  If Selene delivers the signed settlement agreement (as revised), check and proof of credit reporting to our office by close of business tomorrow (1/3/2019), I will refrain from filing the motion.  Otherwise, I will file the motion on 1/4/2019.  Please also advise whether Selene assents, opposes or will take no action concerning this motion.  Thank you.

(Ex. 6 at 3).

69.     Attorney Demerle replied:

We have an agreement.  My client has modified the terms of the loan accordingly.  All that is left to do is finalize the paperwork to memorialize the agreement.

Regarding the $9,000.00 payment of legal fees, I know that you are anxious to get paid. **My client needs you to execute the vendor form that I forwarded to you previously. This is non-negotiable.  If you sign the vendor form, we can close this.**  Let me know.  I will have the other paperwork to you shortly.  Hope you had a happy New Year!

(Ex. 6 at 3 of 8) (emphasis added).

[30]

70.     Attorney Cornetta responded promptly, reiterating that while he would not sign the "vendor form" as he was not a vendor of Selene, he was providing for the third time his W9 form which included all the information that was necessary.  (Ex. 6 at 2).  He also enclosed Selene's statement of December 19, 2018 showing no loan modification.  (Id.).  Attorney Cornetta again reiterated that "if we do not receive the signed settlement agreement (as revised), check and proof of credit reporting by close of business tomorrow (1/3/2019), we will file a motion to restore this case to the active docket on 1/4/2019."  (Id.).

71.     On January 3, 2019, Attorney Demerle responded as follows:

1.      LOAN TERMS.  My understanding is that Selene has already adjusted the terms of this loan in its system to reflect the agreement reached in the mediation in this matter.  The December 19, 2018 statement is outdated.

2.      PERMANENT AGREEMENT.  Your client wants the permanent loan modification agreement – rather than a recitation of the terms – attached to the settlement agreement.  Due to the end-of-the-year rush, Selene expects to have the actual permanent agreement ready for your client's execution no later than next week.

3.      VENDOR FORM.  Because Selene is paying the attorney's fees to you, Selene needs the vendor form executed.  Selene has used this form in other cases in other states with other counsel for the same purpose with no pushback.  **My client will pay you.  My client just needs the form executed.**

Rather than filing your motion, I suggest the following.  My office will draft and file tomorrow an assented-to motion to (1) re-open the case and (2) extend by 30 days the deadline to report problems to the Court.  I appreciate your caution.  We will finalize this agreement, Chris, and my client is willing to handle the paperwork to ensure that your client can report any issues to the Court going forward.

Please let me know if I have your client's assent and I will forward a draft of the motion to you forthwith.  Happy Friday Eve, Chris!

(Ex. 6 at 1) (emphasis added).

[31]

72.     Attorney Cornetta filed the Motion to Reopen the following day, January 4,

2019. (Docket No. 51).  The motion was denied without prejudice on January 7, 2019, the 60th

day, due to a procedural flaw.  (Docket No. 52).  That day, Attorney Demerle suggested to

Attorney Cornetta that he "hold off on filing the revised motion" as he expected his client "to

tell me shortly when the agreement for judgment and permanent modification offer will be

ready to forward to you to finalize this matter."  (Docket No. 79-1).[7]

73.     On January 8, 2019, Selene sent a Loan Modification Agreement directly

to Attorney Cornetta.  (Ex. 8 at 3).  This was the first version of the permanent loan

modification documents that the defendants produced.   The Loan Modification

Agreement ("LMA") provided in relevant part:

> 1.     As of December 1, 2018, the amount payable under the Note and
> the Security Instrument (the "Unpaid Principal Balance") is U.S.
> **$329,242.82**, consisting of the unpaid amount(s) loaned to Borrower by
> Lender plus any interest and other amounts capitalized.
>
> 2.     **$81,242.82** of the New Principal Balance shall be deferred (the
> "Deferred Principal Balance") and Borrower will not pay interest or make
> monthly payment on this amount. The New Principal Balance less the
> Deferred Principal Balance shall be referred to as the "Interest Bearing
> Principal Balance" and this amount is **$248,000.00**.  Interest will be
> charged on the Interest Bearing Principal Balance at the yearly rate of
> **4.500%**, from **December 1, 2018**.  Borrower promises to make monthly
> payments of principal and interest of U.S. **$1,114.92**, beginning on the **1st**
> day of **January, 2019**, and continuing thereafter on the same day of each
> succeeding month until the Interest Bearing Principal Balance and all
> accrued interest thereon have been paid in full. The yearly rate of **4.500%**
> will remain in effect until the Interest Bearing Principal Balance and all

---

[7] As detailed more fully in this court's order of January 2, 2019 (Docket No. 86), in light of the
defendant's clear concurrence in the request for an extension of time, and the affirmative statements by
counsel inducing plaintiff's counsel not to seek to reopen the case in a timely manner, this court found
the defendant's subsequent position that the plaintiff's motion to reopen was untimely to be frivolous.

accrued interest thereon have been paid in full. The new Maturity Date
will be **December 1, 2048**.

3.       Borrower agrees to pay in full the Deferred Principal Balance and
any other amounts still owed under the Note and Security Instrument by
the earliest of; (i) the date Borrower sells or transfers an interest in the
Property, (ii) the date Borrower pays the entire Interest Bearing Principal
Balance, or (iii) the new Maturity Date.

(Ex. 8:LMA at 1-2 of 6)[8]  The Loan Modification Agreement also had a Balloon Payment Rider in

the amount of $107,574.33 due at the end of the mortgage or upon sale of the mortgage

property, whichever occurred first.  (Ex. 8 at 10).

74.       Attorney Cornetta immediately wrote to Attorney Demerle objecting to the

"unpaid principal balance of $329,242.48 when the parties had agreed to a principal balance of

$248,000 at the November 5, 2018 mediation, not $329,242.48."  (Ex. 8 at 3).  The next day

Attorney Cornetta filed the Renewed Motion to Reopen.  (Docket No. 53).  Selene attempted to

contact Attorney Cornetta directly, but he informed Attorney Demerle that he would not return

Selene's call as they were represented by counsel.  (Ex. 8 at 2).

75.       Two days later, on January 11, 2019, Attorney Demerle wrote to Attorney

Cornetta assuring him that he would not be receiving any more phone calls from Selene, and

stating that he was "still waiting for the final loan modification agreement to attach to the

settlement agreement.  I will let you know as soon as I have it.  Happy Friday, Chris!"  (Ex. 8 at

1).  He did not respond to Attorney Cornetta's question about the loan amount.

---

[8] Between Exhibit A on December 13, 2018 and this draft, the deferred principal balance changed from
$125,182.26 to $81,242.82.  It is unclear why this change was made.  Attorney Demerle assumed that
the difference was due to Mr. Swenson's $45,000 payment, although the numbers do not add up.  (See
Demerle:109).

76.     It is undisputed by the defendants that figures like $329,000 and $82,000 were not discussed at the mediation, but $248,000 as the principal balance was.  (Joslyn:90-91; Demerle:125-26).

77.     Finally, on January 30, 2019, Attorney Demerle sent the revised Settlement Agreement and Release of Claims along with the "Permanent loan modification document package" to Attorney Cornetta.  (Ex. 12).  In his cover letter Attorney Demerle wrote "[p]lease let me know if I can advise US DC (MA) that the settlement documents have been finalized and that the case need not be re-opened.  I am happy to draft whatever is appropriate."  (Ex. 12 at 1).  Thus, at this point Attorney Demerle apparently believed that a valid motion to reopen was pending before the court.

78.     Thirty minutes after Attorney Cornetta's receipt of the revised Settlement Agreement and Release of Claims and "Permanent loan modification document package" Attorney Cornetta responded that this was the same agreement as the one he had received from Selene on January 8, 2019 and that it contained the incorrect principal balance amount of $329,242.82, not the $248,000 that the parties had agreed to at the mediation.  (Ex. 15 at 7-8). Attorney Demerle then promptly responded within minutes  that "We agreed that there would be no debt forgiveness; so in order to get Mr. Swenson into an affordable payment, we set the principal balance at $248,000.00 and put the deferred balance at the back **end of the loan as a balloon payment**."  (Ex. 15 at 6-7) (emphasis added).

79.     This was the first time that the deferred principal payment had been referred to as a "balloon payment."  As noted above, the parties had referred to the $107,000 payment as the balloon payment at the mediation.  Attorney Cornetta's notes refer to the balloon payment

[34]

without any reference to deferred principal balance or no debt forgiveness.  The trial

modification plan, Exhibit A and the draft final loan documents all treat the balloon payment

separately from the "deferred principal balance."  Even the defendants' proposed findings of

fact distinguish between the balloon payment and the "no debt reduction" term.

       80.     Within minutes of his receipt of Attorney Demerle's email, Attorney

Cornetta responded that

> [t]he parties agreed that the principal balance would be $248,000.  The
> loan would be a 30 year loan amortized over 40 years, and there would
> be a balloon payment at the end.  There was never any agreement that
> the principal balance would be $329,242.82.  Thank you.

(Ex. 15 at 5).  Attorney Demerle then responded "Chris, that is what the agreement says.

How would you write it differently?" to which Attorney Cornetta responded in part:

> The parties['] agreement was that the unpaid principal balance would be
> $248,000, not $329,242.82, which is what the agreement should reflect.

(Ex. 15 at 4-5).

       81.     Attorney Demerle rejected this statement and wrote:

> Chris, that is incorrect.  We explicitly agreed that there would be no reduction in debt.
> We offered to reduce the debt.  You and your client said "no."  So, you have the
> agreement that is in front of you.

(Ex. 15 at 3).  Attorney Cornetta again repeated:

> The parties agreed that the principal balance would be $248,000.  It would be a 30 year
> loan amortized over 40 years, and that Mr. Swenson would have a balloon payment at
> the end.  That is what the parties agreed to.  Thank you.

(Ex. 15 at 2).  Attorney Demerle then responded: "Chris, **the deferred principal balance is the**

**balloon payment.**  If you have reason to think otherwise, let me know."  (Ex. 15 at 2) (emphasis

added).  Mr. Cornetta then responded that "[t]he deferred principal balance is not the balloon

[35]

payment" and that the balloon payment is included in the balloon payment rider attached to

the loan modification agreement, and is in the amount of $107,574.33.  (Ex. 15 at 1).

82.     Attorney Demerle concluded the email exchange as follows:

Chris, let me amend my prior statement.  The deferred principal balance is "a" balloon
payment – i.e., an amount owed that comes due when the loan matures or is paid off.
At the mediation, we agreed there would be no debt reduction and this agreement
reflects that.

(Ex. 15 at 1).  He repeated this position the next day.  (Ex. 14).

83.     This email exchange supports this court's conclusion that "balloon payment" was

used at the mediation to mean the $107,000 that would be due because of the amortization of

the 30 year loan over 40 years.  The defendants are relying on the (alleged) reference at the

mediation to "no debt forgiveness" to support their position that there was an agreement to

pay the "deferred principal balance" at the end of the mortgage.  For the reasons detailed

above, this court does not find that the defendants stated at the mediation that a sizeable debt

(ranging from $125,000 to $81,000) would be added to the balance due at the end of the loan.

Nor does this court find it credible that there was an agreement to "no debt reduction" at the

conclusion of the mediation.

Additional facts will be provided below as necessary.

## IV.  RULINGS OF LAW

### Elements of an Enforceable Agreement

1.      "[T]he best case is a settled case."  Mathewson Corp. v. Allied Marine Indust.,

Inc., 827 F.2d 850, 852 (1st Cir. 1987).  Settlement agreements are heralded as the "preferred

alternative to costly, time-consuming litigation."  Id.  "[A] settlement negotiated, as here,

'under the eyes of the court [is] a most solemn undertaking....'"  Id. (quoting Warner v.

Rossignol, 513 F.2d 678, 682 (1st Cir. 1975)).  Therefore, if a party reneges on the settlement

agreement, the other party "may seek to enforce the agreement's terms[.]"  Malave v. Carney

Hosp., 170 F.3d 217, 220 (1st Cir. 1999).

      2.     "Without doubt, a district court possesses the authority to insure due

compliance with such a pact" and to "discern whether or not a valid and binding settlement

agreement had been reached, and if so, to enforce it."  Mathewson, 827 F.2d at 852-53.  See

also Malave, 170 F.3d at 220 ("If, however, the settlement collapses before the original suit is

dismissed, the party who seeks to keep the settlement intact may file a motion for

enforcement.").  "[A] trial court may not summarily enforce a purported settlement agreement

if there is a genuinely disputed question of material fact regarding the existence or terms of

that agreement.  In such circumstances, the cases consentingly [sic] hold that the court instead

must take evidence to resolve the contested issues of fact."  Malave, 170 F.3d at 220 and cases

cited.

      3.     "This case arises under the Court's diversity jurisdiction, and the question of

whether the parties entered into an enforceable settlement agreement must be determined in

accordance with Massachusetts contract law."  Davis v. Deutsche Bank Nat'l Tr. Co., No. 12-

11738-JCB, 2015 WL 13679573, at *2 (D. Mass. July 27, 2015) (citing Fid. & Guar. Ins. Co. v. Star

Equip. Corp., 541 F.3d 1, 5 (1st Cir. 2008)).

      4.     "The essential elements for the formation of a contract under Massachusetts law

consist of an offer, acceptance, and consideration."  Doe v. Trs. of Bos. Coll., 892 F.3d 67, 89

(1st Cir. 2018).  "It is axiomatic that to create an enforceable contract, there must be

agreement between the parties on the material terms of that contract, and the parties must have a present intention to be bound by that agreement." Situation Mgmt. Sys., Inc. v. Malouf, Inc., 430 Mass. 875, 878, 724 N.E.2d 699, 703 (2000), and cases cited.

5.    "It is not required that all terms of the agreement be precisely specified, and the presence of undefined or unspecified terms will not necessarily preclude the formation of a binding contract." Id. (citing Lafayette Place Assocs. v. Bos. Redevelopment Auth., 427 Mass. 509, 517–518 & n. 9, 694 N.E.2d 820, 826 & n.9 (1998)).  "The parties must, however, have progressed beyond the stage of 'imperfect negotiation.'" Id. (citation omitted).

6.    "[I]n Massachusetts an enforceable settlement agreement arises when all of the parties to be bound mutually assent to all material terms, even if those terms are not memorialized in a final writing." Hansen v. R.I.'s Only 24 Hour Truck & Auto Plaza, Inc., 962 F. Supp. 2d 311, 314 (D. Mass. 2013) (citing Basis Tech. Corp. v. Amazon.com, Inc., 71 Mass. App. Ct. 29, 40, 878 N.E.2d 952, 961 (2008)).

7.    "An oral agreement to settle a claim . . .may be enforced as any other contract." O'Rourke v. Jason, Inc., 978 F. Supp. 41, 45 (D. Mass. 1997).

### Proof of Mutual Assent

8.    In the instant case, both parties agree that they entered into an enforceable settlement agreement.  However, they argue that the only enforceable agreement was one

[38]

which contained their version of the terms.  Thus, the critical issue is whether there was

"mutual assent to all material terms."[9]

9.    "Although mutual assent is often misleadingly referred to as a 'meeting of the

minds,' the formation of a valid contract under Massachusetts law requires objective, not

subjective, intent."  Greene v. Ablon, 794 F.3d 133, 147 (1st Cir. 2015).  Therefore, "[a] party's

intent is deemed to be what a reasonable man in the position of the other party would

conclude his objective manifestations to mean," and may be inferred from the party's

conduct.  Id. (internal quotation and citations omitted).

10.    "Courts determine that mutual assent, not on the basis of what goes on inside

the parties' heads, but rather on the basis of what they say and do."  Salem Laundry Co. v. New

England Teamsters & Trucking Indus. Pension Fund, 829 F.2d 278, 280 (1st Cir. 1987).

11.    Determining intention "involves considering the credibility of witnesses,

weighing competing, plausible inferences that can be drawn from events and documents,

separating the significant testimony and document evidence from the insignificant, and other

'factual' inquiries[.]"  Id.  The inquiry is not what a party "thought" they intended at the time,

but rather what the other party "would have reasonably understood that intention to be[.]"  Id.

12.    "The intent of the parties is generally a question of fact because the

determination of whether parties intended to be bound must be premised on the totality of all

such expressions and deeds given the attendant circumstances and the objectives of the

---

[9] Neither party argues either unilateral or mutual mistake, so those principles will not be discussed.

parties." <u>Crosby Legacy Co., LLC v. TechnipFMC PLC</u>, No. 18-10814-MLW, 2019 WL 5588993, at

*8 (D. Mass. Sept. 13, 2019) (citing <u>Sinotau Pharm. Grp. V. Navidea Biopharmaceuticals, Inc.</u>,

211 F. Supp. 3d 375, 379 (D. Mass. 2016)).

      13.     In the instant case, the parties clearly discussed and agreed to an unpaid

principal balance of $248,000.  They further clearly agreed to a balloon payment consisting of

the interest that remained because the 30 year mortgage was being amortized over 40 years.

As detailed above, there was no discussion at the mediation that the "balloon" payment also

included a deferred principal payment.

      14.     The requirement of a deferred principal payment may have been in the heads of

Attorney Demerle and Mr. Joslyn, but it was not expressed at the mediation.  On the other

hand, the defendants' representatives did review the terms of the agreement with the

plaintiff's representatives in front of Judge Harrington and did agree to those terms.  There was

mutual assent to the terms of the settlement agreement that did not include a deferred

principal payment.

      15.     It was both reasonable for the plaintiff to assume that there would be no

deferred principal payment due at the end of the mortgage term, and unreasonable for the

defendants to assume that there would such a payment without making any attempt to define

what that amount might be.

      16.     Even if this court were to credit Attorney Demerle's testimony that there was a

statement made about "no debt forgiveness," (which the court does not), any such statement

was vague and made without putting it in any context.  There was no definition of when the

payment would be made, whether it would be interest bearing, how much would be owed, or

any other critical terms that a lender should have defined if it was increasing the plaintiff's obligations by almost 50% at the end of the mortgage loan.[10]  Similarly, giving Mr. Joslyn's very confusing testimony the most generous reading in defendant's favor (which the court is not obligated to do), there was no attempt to define any of the terms of the alleged deferred principal payment.  While the court is sympathetic to the problem of making cell phone calls from the courthouse (although there are land lines that can be used), the defendants have not explained to this court's satisfaction why they could not come up with even a ballpark figure of the amount they were claiming was due.  Rather, the parties all agree that the total amount of the outstanding loan was never discussed.

17.      The plaintiff had been litigating this case for several years at the time of the mediation.  As detailed in the SAC, the plaintiff believed that the defendants had reneged on an earlier loan modification agreement – an agreement which included a reduction in the total amount of principal that would be due under the loan.  As detailed in the SAC and TAC, the amount due on the loan was in dispute.  It was unreasonable for the defendants to assume, if they did, that the plaintiff would simply agree to any number they might set as the amount outstanding.  The existence of a dispute as to the amount due further supports the factual conclusion that there was no discussion of a deferred principal balance before the mediator, and is further evidence that any assumption on the part of the defendants that payment of the disputed amount was an agreed upon term was unreasonable.

---

[10] The balloon payment was to be approximately $107,000.  The defendants' calculations of the deferred principal after the mediation ranged from $125,182.26 to $81,242.82.

18.     For his part, Mr. Swenson was agreeing to make a $45,000 lump sum payment and to rewrite the mortgage amount for $248,000.  The total of this amount exceeded the principal balance due on the loan.  Moreover, the defendants were going to receive all the interest due on this principal loan amount either in monthly payments or as a balloon payment at the end.  These facts, when considered with the arguments raised by the plaintiff challenging the defendants' right to foreclose and his objections to the amounts charged by the lender makes the settlement amount, without the deferred principal balance, reasonable.  This conclusion is buttressed by the fact that the defendants had previously agreed to reduce the principal amount of the loan in prior negotiations.

19.     Finally, this court does not view Attorney Cornetta's post-mediation conduct as evidencing an understanding that there was to be a deferred principal balance.  He was dealing with other breaches of the settlement agreement by the defendants.  He rejected in its entirety the draft of the trial modification plan, and made it clear that the entire loan modification agreement, and not merely an exhibit, had to be attached to a settlement agreement.  When Attorney Cornetta finally received a draft of the final settlement documents, he immediately told defense counsel that the numbers were wrong.  While in retrospect an earlier discovery of the error may have eliminated some motion practice, counsel's failure to note the problem in the earlier communications does not evidence an intent to include a deferred principal balance in the agreement.

[42]

## V. **CONCLUSION**

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the plaintiff's Renewed Motion to Reopen Case (Docket No. 53) be allowed, and that the parties be ordered to execute settlement documents in the form of the Loan Modification Agreement provided by the defendants (Ex. 8), modified to eliminate the "deferred principal balance" and to limit the "Unpaid Principal Balance" to $248,000.00.

In addition, the defendants should be ordered to pay Mr. Swenson or Attorney Cornetta $9,000 in attorney fees, and to provide proof that they requested the agreed-upon corrections to Mr. Swenson's credit reports within fourteen (14) days of the District Judge's order.

While this court acknowledges that the plaintiff has requested that he be awarded additional attorneys' fees from the defendants, the parties have not briefed the issue and this court does not find that there is a basis to enter such an order on the present record.[11]

/ s / Judith Gail Dein_____
Judith Gail Dein
United States Magistrate Judge

---

[11] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days after being served with this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which the objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985). Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).